AJ KUNG, ESQ.
Nevada Bar No. 7052
BRANDY BROWN, ESQ.
Nevada Bar No. 9987
KUNG & BROWN
214 South Maryland Parkway
Las Vegas, Nevada  89101
(702) 382-0883
(702) 387-2720 Fax
ajkung@ajkunglaw.com
bbrown@ajkunglaw.com
    *Attorneys for Debtor*

### UNITED STATES BANKRUPTCY COURT

### DISTRICT OF NEVADA

| | |
|---|---|
| In re: | Case No.  BK-15-15722<br>Chapter 11 |
| CAPRIATI CONSTRUCTION CORP. INC.<br><br>Debtor. | Consolidated Disclosure Statement Hearing<br>Date: **April 27̶8̶, 2016**<br><br>Time: **9:30 a.m.** |

# DEBTOR'S ~~SECOND~~ THIRD AMENDED DISCLOSURE STATEMENT TO SECOND AMENDED PLAN OF REORGANIZATION

. . .

. . .

. . .

. . .

. . .

1

1

## **TABLE OF CONTENTS**

2

Page

1. INTRODUCTION . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  4

    1.1   Purpose of the Disclosure Statement . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 5

    1.2   Acceptance and Confirmation  . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 5

    1.3   Confirmation Without Acceptance by All Impaired Classes . . . . . . . . . . . . . . 6

    1.4   Disclaimer . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .6

2. INFORMATION REGARDING THE CHAPTER 11 ESTATE . . . . . . . . . . . . . . . . . . . . . . .7

    2.1   History of the Debtor and Events Leading to the Filing of
          the Chapter 11 Case . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .7

    2.2   Ownership of Debtor and its Management Before and During Bankruptcy. . . . . . . . 8

    2.3    Steps Taken to Improve Operations and Profitability . . . . . . . . . . . . . . . . . . . . . . . . .
          . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .8

    2.4   Current and Historical Financial Conditions. . . . . . . . . . . . . . . . . . . . . . . . . . .9

    2.5   Co-Debtors. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .10

    2.6   Dealings and Transactions with Insiders and Affiliates. . . . . . . . . . . . . . . . . . . . . . .10

3. DEVELOPMENTS DURING THE COURSE OF THIS
   CHAPTER 11 CASE . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .13

    3.1   Meeting of Creditors . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 13

    3.2   Schedules and Statements of Affairs . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .13

    3.3   Monthly Operating Reports.. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .13

    3.4   Employment of General Counsel . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .13

    3.5   Creditors Committee . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 13

    3.6   Use of Cash Collateral . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  13

4. DESCRIPTION OF ASSETS . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  14

    4.1   Description of Real Property . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .14

    4.2   Description of Personal Property . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .14

5. DESCRIPTION OF DEBTS . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .14

    5.1   Administrative Claims . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 14

    5.2   Priority Claims . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .. . . . . . . . . 15

2

5.3    Secured Claims . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 16

5.4    Unsecured Claims . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 16

5.5    Claims Deadline . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .17

5.6    Claims Objections. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . ...17

6. EXECUTORY CONTRACTS AND UNEXPIRED LEASES . . . . . . . . . . . . . . . . . . . . . . . . 17

7. DESCRIPTION OF PENDING AND COMPLETED LITIGATION. . . . . . . . . . . . . . . . . . . . 19

7.1    Description of Pending and Completed Litigation. . . . . . . . . . . . . . . . . . . . . . . .19

7.2    Summary of Proceedings to Date in the Bankruptcy Case. . . . . . . . . . . . . . . . . .19

8. SUMMARY OF AMENDED PLAN OF REORGANIZATION . . . . . . . . . . . . . . . . . . . . . . . 20

8.1    Classification and Treatment of Claims . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 21

8.2    Treatment of Claims and Interests . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 22

8.3    Means of Implementing and Funding the Plan . . . . . . . . . . . . . . . . . . . . . . . . . .31

9. POST-CONFIRMATION FINANCIAL CONDITION OF THE DEBTOR . . . . . . . .. . . . . . 32

10. POST CONFIRMATION MANAGEMENT OF THE DEBTOR . . . . . . . . . . . . . . . . . . . . 33

11. ALTERNATIVES TO THE PLAN . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 34

12. CERTAIN RISKS TO BE CONSIDERED . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 34

12.1    Risk of Non-Confirmation of the Plan . . . . . . . . . . . . . . . . . . . . . . . . . . . . .35

12.2    Debtor Has No Duty to Update . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 35

12.3    Non-Consentual Confirmation . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .35

12.4    Tax Consequences of the Plan . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .36

12.5    Projections of Operations . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 36

13. CONFIRMATION OF THE PLAN . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 36

13.1    Confirmation of the Plan . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .36

13.2    Objections to Confirmation of the Plan . . . . . . . . . . . . . . . . . . . . . . . . . . . . .36

3

14    AVOIDANCE ACTIONS………………………………………………………….41

15    CONCLUSION ………………………. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 43

1. **<u>INTRODUCTION</u>**

    This Disclosure Statement (hereinafter the "Disclosure Statement") is provided to creditors in connection with the solicitation of acceptances of the Debtor's Plan of Reorganization attached hereto as **Exhibit "1"** (the "Plan"[1]), or any subsequent amended plan of reorganization. The Debtor's reorganization case is under Chapter 11 of the United States Code, and was initiated on October 7, 2015 in the United States Bankruptcy Court for the District of Nevada, as Case No. BK-15-15722. The Plan provides for the treatment of claims of creditors and interest of the equity security holder[2].

    The objective of a Chapter 11 bankruptcy case is to obtain Bankruptcy Court approval of a plan of reorganization. This process is referred to as confirmation of a plan. A plan describes in detail (and in language appropriate for a legal contract) the means for satisfying the claims and equity interests in a Debtor. After a plan has been filed, the holders of such claims and equity securities that are "impaired" (a term defined in Bankruptcy Code Section 1124 and discussed in detail below) are permitted to vote to accept or reject the plan.

    Before a Debtor or other plan proponent can solicit acceptances of a plan, Bankruptcy Code Section 1125 requires the Debtor or other plan proponent(s) to prepare a disclosure statement containing adequate information of a kind, and in sufficient detail, to enable those parties entitled to vote on the plan to make an informed judgment about the plan and whether they should accept or reject the plan.

---

[1] Capitalized terms not otherwise defined herein will have the same meaning as are ascribed to such terms in the Plan which is filed contemporaneously herewith.

[2] An equity security of the Debtor as the term is defined in Section 101(16) of the Bankruptcy Code includes any ownership interest in the Debtor, including membership interests.

### 1.1    Purpose of the Disclosure Statement

The purpose of this Disclosure Statement is to ensure that claimants have adequate information to enable each class to make an informed judgment about the Plan.  The assets and liabilities of the Debtor are summarized herein.

This Disclosure Statement describes the business background and operating history of the Debtor before the filing of the case.  It also summarizes certain significant events that have taken place during the case and describes the terms of the Plan, which divides creditor claims and the interests of shareholders into classes and provides for the satisfaction of allowed claims and interests.

The Court will set a time and date as the last day to file acceptances or rejections of the Plan.  Thereafter, a hearing on confirmation of the Plan will be held in the United States Bankruptcy Court for the District of Nevada, located at the Foley Federal Building, 300 Las Vegas Boulevard South, Las Vegas, Nevada 89101.  Creditors may vote on the Plan by filling out and returning a specific form of ballot to Debtor's counsel.  The form of ballot and special instructions for voting will be forthcoming upon approval of the Disclosure Statement by the Court.  Creditors are urged to carefully read the contents of this Disclosure Statement before making a decision to accept or reject the Plan.

### 1.2    Acceptance and Confirmation

In order for the Debtor's Plan to be confirmed, each impaired class of claims or interests must accept the Plan, except as set forth below.  In order for the Plan to be deemed accepted, a majority in number and two-thirds in dollar amount of the claims of each class of creditors impaired under the Plan of those that actually vote, must vote for accepting or rejecting the Plan.

Classes of claims that are not "impaired" under a Plan are deemed to have accepted the Plan.  Acceptances of the Plan are being solicited only from those persons who hold claims or interests in

impaired classes.  A class is "impaired" if the legal, equitable or contractual rights attaching to the claims or interests of that class are modified, other than by curing defaults and reinstating maturities, or by payment in full in cash.

### 1.3    Confirmation Without Acceptance By All Impaired Classes

The Bankruptcy Code contains provisions for confirmation of a Plan even if the Plan is not accepted by all impaired classes, as long as at least one impaired class of claims has accepted the Plan.  These "cram-down" provisions for confirmation of a Plan, despite the non-acceptance of one or more impaired classes of claims or interest, are set forth in  §1129 (b) of the Bankruptcy Code.

If a class of unsecured claims rejects the Plan, it may still be confirmed so long as the plan provides that (i) each holder of a claim included in the rejecting class receive or retain on account of that claim property which has a value, as of the Effective Date, equal to the allowed amount of such claim; or that (ii) the holder of any claim or interest that is junior to the claims of such class will not receive or retain on account of such junior claim or interest any property at all.

If a class of secured claims rejects the Plan, it may still be confirmed so long as the Plan provides (i) the holders of such claims retain the lien securing such claim; (ii) the holders of such claims receive on account of such claims deferred cash payments totaling at least the allowed amount of such claims, of a value, as of the Effective Date of the Plan, of a least the value of such claimant's interest in such property; (iii) for the sale of the property in accordance with §1129(b)(2)(A)(ii); or (iv) for the realization by such claimants of the indubitable equivalent of the claim.

### 1.4    Disclaimer

No representations concerning the Debtor are authorized by the Debtor except as set forth in this Disclosure Statement.  Any representations or inducements made to secure your acceptance or rejection of the Plan other than as contained herein have not been authorized and should not be

relied upon by you in making your decision, and such additional representations and inducements should be reported to counsel for the Debtor, who in turn should deliver such information to the Court for such action as may be deemed appropriate.  The information contained herein has not been subjected to a certified audit.  The records kept by the Debtor and other information relied on herein are dependent upon investigations and accounting performed by the Debtor and others employed by the Debtor.  The Debtor is unable to warrant that the information contained herein is without inaccuracy, although a great effort has been made to be accurate, and the Debtor believes that the information contained herein is, in fact, accurate.

2. **INFORMATION REGARDING THE CHAPTER 11 ESTATE**

2.1      **History of the Debtor and Events Leading to the Filing of the Chapter 11 Case.**

Debtor, Capriati Construction Corp. Inc., a Rhode Island Corporation, is a civil construction company that builds bridges, roadways, channels, underground utilities, earthwork, building demolition, structural concrete, landscaping, earthwork, and engages in building demolition, site improvements for residential developments, structural concrete, and selective environmental cleanup for public works and private construction projects.  Prior to the recession, Capriati was financially very strong, typically with an average of $55,000,000.00 to $65,000,000.00 annually, with net profits of approximately $3,500,000.00 to $5,500,000.00 annually.  Unfortunately, due to the recession that crippled the construction industry Capriati was overly aggressive with bids and then over extended itself with loans.  Because of Capriati's significant cash reserves, developed over twenty years of business, Capriati did not experience severe financial hardship until the last few years.  When Capriati's loans became due, Capriati refinanced approximately $4 million in loans with Nations Fund.  The Nations Fund loan was at a high rate of interest (12%) and did not have favorable terms to Capriati.  Shortly after procuring the loan with Nations Fund, Capriati was advised that some of its projects would be delayed in commencement.  Due to the delays,

corresponding progress payments were similarly delayed, thereby leaving Capriati with short term cash shortages which caused Capriati to default on the Nations Fund loan.  Capriati sought a forebearance agreement, but Nations Fund refused to accommodate any of Capriati's requests.  Moreover, Nations Fund aggressively sought to seize Capriati's equipment (which collateralized the Nations Fund loan), which would have caused Capriati to close its doors.  As a result of Nations Funds aggressive collection tactics, Capriati was forced to file for Chapter 11 relief.

**2.2    Ownership of Debtor and Its Management.**

David Rocchio, Sr. is 100% owner of the Debtor.  During the two years prior to the date on which the bankruptcy petition was filed, David Rocchio Sr. was the sole officer, director, manager, and person in control of Debtor.

David Roccho Sr. has been the sole manager of Debtor during the Debtor's chapter 11 case.

After the effective date of the order confirming the Plan, David Rocchio Sr. shall be the sole director, officer and manager of Debtor.  There will be no voting trustees of Debtor, and no affiliate of Debtor will be participating in a joint Plan with the Debtor.  There will be no successor of the Debtor under the Plan.  David Rocchio Sr. will receive a salary in the sum of $6,108.00 per month. David Rocchio Sr. will not receive any income through Debtor will make monthly rental payments to Wigwam and or Caserta (see discussion in Section 6, below), but such since the rental payments remitted by Debtor to Wigwam and Caserta are less than the fair market rental value of the properties leased, and said sum is less than or equal to the secured debt payments owed by Wigwam and Caserta on the properties.

**2.3    Steps Taken to Improve Operations and Profitability.**

Debtor's operations and work force have always operated efficiently. Primarily, Debtor's pre-petition failure was due to the downturn and recession from prior years which resulted in less construction contracts and work for Debtor.  As a result, Debtor agreed to accept jobs with

significantly lower profit margins in order to keep Debtor's approximately 100 employees working. Post-petition, Debtor has aggressively procured substantially more construction contracts, and has ~~only agreed~~established a policy of ~~to~~ accepting contracts wherein Debtor's expects to receive gross profit margins equal to or more than 15%.  Additionally, due to the recession, there were fewer~~less~~ public work projects available, thereby causing Debtor to seek more private work with smaller scopes of work and lower profit margins.  Debtor has seen a marked increase in the public works jobs becoming available, and has aggressively sought to procure those contracts.  Post petition, Debtor has obtained several new public work projects, as well as many additional private contracts. (**See Exhibit "8~~7~~".**)   Finally, Debtor has also instated his son, David Rocchio Jr. a~~s~~t the Chief Financial Officer of the company to ensure that the financial aspects of the company are supervised by a trusted and loyal employee.

**2.4    Current and Historical Financial Conditions.**

The identity and estimated fair market value of the estate's assets are listed in **Exhibit "3."** The source and basis of the valuation is comprised from the appraised values of the assets as previously appraised by Ritchie Bros, Jack Lyon, and any other appraiser who provided an appraisal of Debtor's assets to Debtor; and of values determined by David Rocchio Sr. based upon his knowledge and expertise developed over the past 30 years of buying and selling heavy equipment and machinery on behalf of Debtor.

Debtor's March, 2016 Monthly Operating Report (including case to date information) is attached as ~~periodic operating reports filed since the commencement of Debtor's bankruptcy case are set~~ summarized as set forth on **Exhibit "2".**  ~~It should be noted that Debtor will be filing amended monthly operating reports, as the Debtor has discovered that the forms utilized for the monthly reports have automatically calculated formulas contained in the form, some of which were corrupt or inadvertently altered in the forms utized by Debtor, thereby resulting in incorrect~~

9

cumulative amounts.   Although prior Monthly Operating Reports have been corrected, Debtor believes that the amended Monthly Operating Reports currently on fileThe monthly operating reports are true and accurate.   The monthly operating reports are on file with the Bankrutpcy Court and can be downloaded from the Court website at ecf.nvb.uscourts.gov for a fee.   Alternatively, upon written request, a copy of the monthly operating report(s) will be provided by Debtor's counsel.

**2.5     Co-Debtors.**

David Rocchio, Sr. and Laurie G. Rocchio are co-debtors on the loans with Nations Fund. David Rocchio, Sr. is also a co-debtor on the loans with Valley Bank, Plaza Bank, Entrust, Caterpillar Financial and John Deere.

**2.6     Dealings and Transactions with Insiders and Affiliates.**

Pursuant to 11 U.S.C. §101(31), an "insider" of a debtor corporation includes: (i) director of the debtor; (ii) officer of the debtor; (iii) person in control of the debtor; (iv) partnership in which the debtor is a general partner; (v) general partner of the debtor; or (vi) relative of a general partner, director, officer, or person in control of debtor.   Debtor has transactions with the following "insiders" whom are paid the following compensation:

(i)      David Rocchio Sr. is an officer and the person in control of debtor and draws a reduced salary in the sum of $6,108.00 per month;

(ii)     David Rocchio Jr. is the son of David Rocchio Sr. and is employed by Debtor as Chief Financial Officer and Project Manager, and currently being paid reduced wages in the sum of $20.00 per hour;

(iii)    Lauren Rocchio is the daughter of David Rocchio Sr. and is employed by Debtor as a concrete finisher, and currently draws a wages in the sum of $16.00 per hour;

(iv)     Michele D'Orsi is the cousin of David Rocchio Sr. and is employed by Debtor as a

10

Project Manager, and currently draws a salary ~~in the sum~~ of $4,220.84 per month, with is equal to or less than the industry standard wage for this position;

(v)     Patriot Fuel, Lube & Maintenance, Inc. is owned by David Rocchio Sr.'s cousin, Michele D'Orsi.  Pre-petition, Patriot provided fuel, mechanical, and lube services to Debtor in the ordinary course of business.  The charges for Patriot's fuel and lube services were standard and customary, and did not exceed the fair market value for the fuel and services charged.  In late March of 2015, Debtor was unable to remit payment to Patriot for the amounts due and owing, and as a result, Patriot terminated its fuel and services to Debtor.  As of the Petition Date, Debtor owed Patriot approximately $207,013.95 for pre-petition debt.  Patriot is not receiving any preferential treatment under the Plan, and no "preferential" payments were made to Patriot within the year prior to the Petition date.

Pursuant to 11 U.S.C. §101(2), "affiliate" means: (a) an entity that directly or indirectly owns, controls, or holds with power to vote, 20 percent or more of the outstanding voting securities of the debtor; (b) a corporation 20 percent or more of whose outstanding voting securities are directly or indirectly owned, controlled, or held with power to vote, by the debtor, or by an entity that directly or indirectly owns, controls, or holds with power to vote, 20 percent or more of the outstanding voting securities of the debtor; (c) person whose business is operated under a lease or operating agreement by a debtor, or person substantially all of whose property is operated under an operating agreement with the debtor; or (d) entity that operates the business or substantially all of the property of the debtor under a lease or operating agreement.

Debtor also has had dealings and transactions with the following "affiliates":

(i)     Wigwam 1020, LLC. ("Wigwam").  This entity was formed on March 25, 2010 with the Nevada Secretary of State, and is owned solely by David Rocchio Sr.  **No assets**

11

**have ever been transferred by Debtor to Wigwam,** and Debtor does not contribute any funds to this entity; and no employees or assets of the Debtor are utilized by this entity. The sole asset of this entity is the real property located at 1020 Wigwam. Debtor leases approximately 9,400 square feet of office space from Wigwam for the sum of $8,000.00 per month ($.85 per square foot), which is not above market value. (For example, another office building located on Wigwam is advertising rental rates of $1,25-$1.75 per month.)

(ii)  Caserta, LLC. This entity was formed on July 28, 2000 with the Nevada Secretary of State, and is owned by David Rocchio Sr. (50%) and Michele D'Orsi (50%). **No assets have ever been transferred from Debtor to Caserta LLC.** The sole asset of this entity is the real property located at 4820 East La Mancha Drive in North Las Vegas, Nevada. Debtor leases a portion of this property to utilize as the storage yard for Debtor for the monthly rent of $ 6,500.00 per month which is not above market value and is not proportionely less than the rent paid by the other two renters.

(iii)  Las Vegas Crushing LLC. This entity was formed on February 24, 2012 with the Nevada Secretary of State and is owned solely by David Rocchio Sr. **No assets have ever been transferred from Debtor to Las Vegas Crushing LLC.** Debtor has not and does not engage in any transactions with Las Vegas Crushing, LLC.

(iv)  Horizon Desert Commons, LLC. ("Horizon") This entity as formed on September 27, 2006 with the Nevada Secretary of State. **No assets have ever been transferred from Debtor to Horizon.** Horizon was initially formed with three partners, including David Rocchio Sr., for the purpose of purchasing and owning real property. Years ago, Rocchio Sr. purchased the interest of the other two partners, and the real property was sold owned by Horizon ~~was sold~~ in late 2013-early 2014. Horizon was

12

closed as a business and has not engaged in any business or operations since the sale of the property. Debtor has not and does not engage in any transactions with Horizon.

(v)     Rocchio Morgan Seidl, LLC ("RMS"). This entity was formed on December 20, 2004 with the Nevada Secretary of State. RMS is owned by 50% by David Rocchio Sr. and 50% by Michele D'Orsi. **No assets have ever been transferred from Debtor to RMS.** RMS purchased and owns 4 parcels of property at the corner of Las Vegas Boulevard and St. Rose Parkway, which property is encumbered by a Deed of Trust in favor of Plaza Bank securing its loan to Debtor. Debtor has not and does not engage in any other transactions with RMS.

**3.   DEVELOPMENTS DURING THE COURSE OF THIS CHAPTER 11 CASE**

**3.1    Meeting of Creditors**

The United States Trustee conducted a meeting of creditors pursuant to 11 U.S.C. §341 on November 12, 2015. The Debtor appeared through David Rocchio, Sr. The meeting of creditors was continued two times, and ultimately finally concluded on February 11, 2016. [Dkt. No. 308.]

**3.2    Schedules and Statement of Affairs**

The Debtor filed its schedule of assets and liabilities and statement of financial affairs on October 16, 2015. Debtor amended its statements and schedules on January 12, 2016 and again on January 24, 2016. Those schedules and statements may be viewed online at www.nvb.uscourts.gov or may be obtained from the Bankruptcy Clerk for a fee.

**3.3    Monthly Operating Reports**

Monthly operating reports reflecting the Debtor's ongoing financial status are filed with the United States Bankruptcy Court and are summarized in as **Exhibit "2."**

**3.4    Employment of General Counsel**

On October 8, 2015, the Debtor filed an Application to Employ the Law Offices of Kung &

13

Brown as its attorney of record.  Said Motion was granted by the Court.

**3.5      Creditors Committee**

There is no Creditors Committee in this case.

**3.6      Use of Cash Collateral**

The Court has authorized the use of cash collateral pursuant to Debtor's stipulation with Plaza Bank.  [Dkts. No. 80 and 116].

**4.  <u>DESCRIPTION OF ASSETS</u>**

**4.1      Description of Real Property**

The Debtor owns no real property.

**4.2      Description of Personal Property**

The Debtor owns personal property primarily consisting of trucks, construction equipment and machinery, general office items, and accounts receivables, all of which is over- encumbered by secured debt.  The list of Debtor's personal property, and identity of the secured parties is set forth in its amended Statements and Schedules filed with the Bankruptcy Court [Dkt. No.200], and is further delineated in **Exhibit "3".**

**5.  <u>DESCRIPTION OF DEBTS</u>**

**5.1      Administrative Claims**

(A)      <u>Professional Fees</u>.  The Debtor will be obligated to pay attorneys' fees and costs owed to Kung & Brown, subject to Court approval.  Kung & Brown has agreed to accept full payment on its claim on the Effective Date.  Debtor has also sought to engage Donald R. Parker as an interest rate expert.

Debtor will also seek the engagement of an appraiser for Debtor's equipment.  <u>Debtor will also seek the services of a feasibility expert.</u>

The Debtor estmates that professional fees and costs as of the Effective Date will be in the range of $200,000.00 to $300,000.00, which may increase or decrease depending on the number of contested matter and adversary proceedings that will be required during the duration of the Chapter 11 Case.

(B)    U.S. Trustee Fees.  All fees required to be paid to the United States Trustee will be paid in full upon the Effective Date of the Debtor's Plan.  U.S. Trustee fees due in this case have been paid.

(C)    Goods Received Within 20 Days of Petition Date.  11 U.S.C. §503(b)(9) provides that a creditor may have an allowed administrative expense claim for "the value any goods received by the debtor within 20 days before the date of commencement of a case under this title in which the goods have been sold to the debtor in the ordinary course of such debtor's business."  Here, Debtor does not anticipate any administrative claims pursuant to §503(b)(9) because all of Debtor's subcontractors and suppliers have been on joint-check agreements, wherein the owners/developers have agreed to remit payment for materials to directly to the subcontractors and suppliers via joint two-party checks.

(D)    Post-Petition Loans.  David Rocchio, Sr. has loaned the Debtor approximately $268,000.00557,000 since the Petition Date. David Rocchio, Sr. did not file a Motion for approval nor obtain Bankruptcy Court approval of the loans under 11 USC §364, and considers such loans to be made in the ordinary course of business.  However, rather than request repayment of his post-petition loans, Mr. Rocchio is contributing such funds, as well as an additional cash infusion on the Effective Date of not less than $232,000, in exchange for retention of the equity interests in the Debtor.  At present, due to the fact that the obligations of the Debtor are well in excess of its assets, as well as the fact that substantially all of its assets are overencumbered, there is no monetary value of such equity interest.  as he did not find it appropriate or necessary.  Such sums will not be repaid,

~~but will be utilized to purchase 100% of the equity in the reorganized Debtor.  Mr. Rocchio will also~~

~~contribute additional funds of not less than $232,000.00 on the Effective Date.~~

**5.2     Priority Claims**

Priority tax claims are unsecured income, employment, and other taxes described by §507(a)(8) of the Code.  Unless the holder of such a §507(a)(8) priority tax claim agrees otherwise, it must receive the present value of such claim, in regular installments paid over a period not exceeding 5 years from the order of relief.  The Debtor estimates priority claims as follows:

| Creditor | Nature of Lien | | Estimated Amount of Priority Claim |
|---|---|---|---|
| Nevada Department of Taxation | Sales Tax | | $37,744.59 |
| Internal Revenue Service | Taxes | | $84,125.97 |
| **TOTAL** | | | **$121,870.56** |

**5.3     Secured Claims**

The Debtor has scheduled against it the following secured claims:

| Creditor | Nature of Lien | Estimated Amount of Secured Claim |
|---|---|---|
| Nations Fund I, LLC | Security Interest | TBD |
| Caterpillar Financial Services Corp. | Security Interest | $1,423,870.32 |
| John Deere Construction & Forestry | Security Interest | $230,315.81 |
| Ford Credit | Security Interest | $89,640.60 |

16

| Don Ahern | Security Interest | $115,754.80 |
|-----------|-------------------|-------------|
| Ally | Security Interest | $34,897.77 |
| Plaza Bank | Security Interest | $1,986,022.87 |
| Fidelity | Security Interest | TBD |
| Entrust | Security Interest | TBD |
| Valley Bank | Security Agreement | TBD |
| **TOTAL** | | Approximately $ 3,880,502.17 plus amounts TBD |

### 5.4    Unsecured Claims

A summary of unsecured claims, whether scheduled by the Debtor in Amended Schedule F of Debtor's Bankruptcy Petition or as asserted in proofs of claim on file, is set forth on **Exhibit "65".**

### 5.5    Claims Deadline

In accordance with the Bankruptcy Court's Notice of Chapter 11 Bankruptcy Case, Meeting of Creditors, & Deadlines filed on October 7, 2015 the deadline for filing a proof of claim for all creditors in the action except for governmental agencies is 90 days after the date first set for the meeting of creditor; for governmental agencies, the deadline to file a proof of claim is 180 days after the order for relief is entered.  The date first set for the meeting of creditors was November 12, 2015 and order for relief was entered on October 7, 2015.

### 5.6    Claims Objections

17

Except to the extent that a claim is already allowed pursuant to a final non-appealable order, the debtor reserves the right to object to claims.  Therefore, even if your claim is allowed for voting purposes, you may not be entitled to a distribution if an objection to your claim is later upheld.

**6.   EXECUTORY CONTRACTS AND UNEXPIRED LEASES**

Debtor will assume the following leases:

    a.   Caserta, LLC-  property lease for 4820 E. La Mancha, Las Vegas, NV 89115 (storage yard):

        i.   Balance Due:  $155,000.00

        ii.   Monthly Payment:  $6,500.00

        iii.   Remaining Term:  12 months

        iv.   Arrears:  $77,000.00 (to be paid in 60 equal monthly installments)

As disclosed herein above, Caserta LLC is owned by David Rocchio Sr.  The lease agreement between Debtor and Caserta LLC is for an amount equal to or below fair market value, and Debtor's lease payment is not proportionately more than the other two tenants renting the remainder of the property.

    b.   Wigwam 1020 LLC – property lease for 1020 Wigwam Parkway, Henderson NV 89074-0000 (office);

        i.   Balance Due:  $120,000.00

        ii.   Monthly Payment:  $8,000.00

        iii.   Remaining Term:  12 months

        iv.   Arrears:  $24,000.00 (to be paid in 60 equal monthly installments)

As disclosed herein above, Wigwam 1020 LLC is owned by David Rocchio Sr.  The lease agreement between Debtor and Wigwam 1020 LLC is for an amount equal to or below fair market value.

    c.   Excavators and Loaders (Combined Single) Lease for the following pieces of equipment:

        336EL Caterpillar Hydraulic Excavator, Serial No. BZY00226
        336EL Caterpillar Hydraulic Excavator, Serial No. BZY00232
        336EL Caterpillar Hydraulic Excavator, Serial No. BZY00189
        336EL Caterpillar Hydraulic Excavator, Serial No. ZY00291
        950K Caterpillar Wheel Loader, Serial No. R4A01189

**Formatted:** Indent: Left:  0.5", Hanging:  1", No bullets or numbering

18

         i.   Balance Due:       $942,040.19

         ii.  Monthly Payment:   $ 22,791.41

         iii. Remaining Term:    33 months

         iv. Arrears:        $126,615.76 (to be paid in 24 equal
                         monthly installments)

Debtor will assume the following leases ~~to the extent~~if they are determined to be true leases by the Court, and not previously paid ~~off~~ by Nations Fund:

c.     Caterpillar Financial Services Corporation equipment leases for:

    1.    160M Caterpillar Moto Grader, Serial No. D9T00117

        i.     Balance Due:     $193,443.73

        ii.    Monthly Payment:   $4,905.96

        iii.   Remaining Term:   18 months

        iv.    Arrears:       $27,960.20  (to be paid in 12 equal
                         monthly installments)

    2.    14M Motor Grader, Serial No. B9J00823

        i.     Balance Due:     $234,817.21

        ii.    Monthly Payment:   $4,406.37

        iii.   Remaining Term:   18 months

        iv.    Arrears:       $43,751.01 (to be paid in 12 equal
                         monthly installments)

~~3.    Excavators and Loaders (Combined Single) Lease for the following pieces of equipment:~~

~~336EL Caterpillar Hydraulic Excavator, Serial No. BZY00226~~
~~336EL Caterpillar Hydraulic Excavator, Serial No. BZY00232~~
~~336EL Caterpillar Hydraulic Excavator, Serial No. BZY00189~~
~~336EL Caterpillar Hydraulic Excavator, Serial No. ZY00291~~
~~950K Caterpillar Wheel Loader, Serial No. R4A01189~~

~~i.  Balance Due:     $942,040.19~~

19

Formatted: Indent: Left: 0.5"

ii. Monthly Payment:    $ 22,791.41

iii. Remaining Term:    33 months

iv. Arrears:    $126,615.76 (to be paid in 24 equal monthly installments)

Debtor will assume all pre-petition executory Joint-Check Agreements between Debtor, Owner/Developer, and third party subcontractors and material suppliers, as well as all executory construction contracts, as identified in Schedule G, as may be amended by Debtor.

## 7. DESCRIPTION OF PENDING AND COMPLETED LITIGATION AND SUMMARY OF PROCEEDINGS TO DATE IN THE BANKRUPTCY CASE.

### 7.1 Description of Pending and Completed Litigation.

The following is a description of the litigation that was pending pre-petition against the Debtor:

a.    Nations Fund I, LLC v. Capriati Construction Corp.; David M. Rocchio & Laurie Rocchio A-15-723113-B- Breach of Contract- open

b.    SPER, Inc. v. Capriati Construction Corp., Inc. A-15-723443-C- Breach of Contract- open

c.    RDO Equipment Co. v. Capriati Construction -A-15-718294-F-Breach of Contract- open

d.    KLC of Willmar, Inc. v. Capriati Construction Corp., Inc.- District Court North Central Judicial District (North Dakota)-Breach of Contract-Judgment

e.    Prairie Supply, Inc. v. Capriati-A-15-717389-F- Breach of Contract-Judgment-open

f.    Keller Landscaping and Paving v. Capriati, Breach of Contract-open

g.    North Core Corporation- 51-2015-CV-01361-Breach of Contract- District Court of County Ward State of North Dakota- open

h.    Main Electric Construction v. Capriati -51-2015-CV-00731- District Court of Cass, North Dakota- Breach of Contract-Judgment

### 7.2 Summary of Proceedings to Date in the Bankruptcy Case.

a.    Debtor filed Chapter 11 Bankruptcy on October 7, 2015.

b.      Debtor filed first day Motions including, Motion to Use Cash Collateral, Application to Employ Kung & Brown, Motion for Order Prohibiting Utility Companies from Altering, Refusing, or Discontinuing Service on October 8, 2015.

c.      Nations Fund filed a Motion for Relief from Stay on October 15, 2015 that was set for an evidentiary hearing.

d.      Debtor filed its Schedules on October 15, 2015.

e.      Debtor's appeared for First Day Motions on October 16, 2015.

f.      Thereafter, Debtor appeared for its 2004 exam noticed by Nation's Fund.

g.      Debtor entered into a Stipulation for Cash Collateral with Plaza Bank on or about October 28, 2015.

h.      Debtor appeared for its 341 Exam on or about November 12, 2015, which was continued to January 21, 2016.

i.      Debtor entered into a Stipulation with Ford Motor Credit to Cure Post Petition arrears on December 16, 2015.

j.      Debtor filed a Motion to Sell Free and Clear of Liens Under Section 363(f) on December 23, 2015.

k.      Debtor entered in a Stipulation with Nations Fund to Provide Adequate Protection, Consent for Sale of Certain Collateral, and to Postpone Evidentiary Hearing on Motion to Terminate the Automatic Stay on December 23, 2015.

l.      Debtor filed a Motion to Value and Modify Rights of BFS Capital, Fidelity, and Plaza Bank with Regards to Certain Equipment only on January 4, 2016.

m.      Debtor filed three Motions to Value [Dkt Nos. 190, 238 & 241] which are scheduled to be heard by the Court on March 1, 2016, or at such future date as the Court may allow.

n.      Settlement with Nations Fund.  On March 23, 2016, Debtor and Nations Fund participated in a settlement conference before the Hon. Judge Herb Ross.  Following the settlement conference, Nations Fund and Debtor were able to reach agreement as to a settlement of the Nations Fund Claim (the "Settlement").  The Settlement is described in the Stipulation between Debtor and Nations Fund filed on April 8, 2016 as Docket No. 450.  The Settlement calls for the Debtor to sell the Nations Fund Collateral and pay specified proceeds (either $5.1 if Debtor is unable to include certain Graders in the sale or $5.5 million dollars if the Graders are included) to Nations Fund.  In addition, Debtor shall pay $40,000 to Nations Fund on the Effective Date.  A motion to approve sale procedures is currently set for hearing on April 27, 2016.  If the Graders are not included in the sale, Debtor will either deliver the Graders to Nations Fund or pay an additional $400,000 to Nations Fund.  Following the sale, Debtor plans to rent needed equipment.  Debtor believes that the cost of renting such equipment would be comparable to the $53,000 per month currently being paid to Nations Fund.  If the proposed sale does not close, Nations Fund will have the right to foreclose on the equipment constituting its collateral, and the Debtor would still obtain needed equipment primarily via rentals.

**8.      SUMMARY OF DEBTOR'S PLAN OF REORGANIZATION**

**THE FOLLOWING IS A BRIEF SUMMARY OF THE DEBTOR'S PLAN OF REORGANIZATION WHICH IS FILED CONCURRENTLY HEREWITH (the "Plan"), AND SHOULD NOT BE RELIED UPON FOR VOTING PURPOSES.  THE SUMMARY IS NOT COMPLETE, AND CREDITORS ARE URGED TO READ THE PLAN IN FULL.  A COPY OF THE DEBTOR'S PLAN OR REORGANIZATION WILL BE PROVIDED TO ALL CREDITORS.   TO THE EXTENT THE FOLLOWING SUMMARY INCLUDES DEFINED TERMS, THOSE DEFINITIONS ARE INCLUDED IN THE PLAN FILED CONCURRENTLY HEREWITH.  ALL CAPITALIZED TERMS HEREINAFTER HAVE THE MEANINGS SET FORTH IN THE PLAN.**

**8.1     Classification and Treatment of Claims**

The Plan designates twelve (12) classes of claims.  Those classes take into account the differing nature and priority of the various classified claims under the Bankruptcy Code.

The following table briefly summarizes the classification and treatment of all Claims under the Plan and the consideration distributable on account of such Claims under the Plan. The information set forth in the following table is for convenience of reference only, and each holder of a Claim should refer to the Plan for a full understanding of the classification and treatment of Claims provided for under the Plan. Claims will receive designated treatment within a Class only to the extent Allowed within that class. The Claim allowance procedure is an ongoing process and the actual amount of the Allowed Claims may vary from the estimates.

| CLASS | CLAIMS | SUMMARY OF TREATMENT |
|---|---|---|
| Class 1 | Nations Fund I, LLC | Creditor will be paid its Allowed Secured Claim either via payment of $5,540,000 pursuant to the terms of the Settlement or via payment of $5,140,000 if the plus return of the Graders are not sold/purchased.(in an amount to be determined by the Court) at 6% per annum in monthly payments of $53,000.00 for 42 months with a balloon payment due thereafter. The balance of the claim claim will be classified as an unsecured non-priority claim (Class 12). This class is impaired. |
| Class 2 | Caterpillar Financial Services Corp. | The loan term shall be extended and the interest rate lowered. This class is impaired. |
| Class 3 | John Deere Construction & Forestry Co. | The loan term shall be extended. This class is impaired. |
| Class 4 | Ford Credit | The loan term shall be extended and the interest rate lowered. This class is impaired. |
| Class 5 | Don Ahern | The loan term shall be extended and the interest rate lowered. This class is impaired. |
| Class 6 | Ally | The loan term shall be extended and the interest rate lowered. |
| Class 7 | Plaza Bank | The loan term shall be extended and re-amortized. This class is impaired. |
| Class 8 | Fidelity Secured Claim | Creditor will be paid its Allowed Secured Claim (estimated at $497,132.03) in monthly payments over ten years with an annual interest rate of 6%. The balance of the claim shall be classified as an unsecured non-priority |

23

| | | claim (Class 12). This class is impaired. |
|---|---|---|
| Class 9 | Entrust Secured Claim (if any) | Creditor will be paid its Allowed Secured Claim in monthly payments over ten years with an annual interest of 4%. The balance of the claim will be treated as an unsecured non-priority claim (Class 12). This class is impaired. |
| Class 10 | Valley Bank Secured Claim (if any). | Allowed Secured Claim to be paid in monthly payments over ten years with an annual interest of 4%. The balance of the claim will be treated as an unsecured non-priority claim (Class 12). This class is impaired. |
| Class 11 | Mechanic's Lien Claimants/Joint Check Agreement Parties | Creditors will continue to receive joint-party checks from Owners/Developers per agreements with Owners/Developers. Any remaining balance will be treated as an unsecured non-priority claim (Class 12). |
| Class 12 | Unsecured Non-Priority | All unsecured claims shall receive distributions equal to ten percent (10%) of the allowed claim, which shall be paid by Equity Member's contribution of New Value in the total sum of $500,000.00 on or before the Effective Date plus payments of not less than $70,000.00 per year, each year commencing on the first annual anniversary of the Effective Date, until this Class has received the allotted distribution. This class is impaired. |
| Class 13 | Membership Interest | Retain equity in exchange for New Value but shall not receive any distribution until payments to Classes 1 through 12 are completed pursuant to the plan. This class is impaired. |

**8.2    Treatment of Claims and Interests**

Each creditor class shall be treated as follows:

**8.2.1    Class 2 1 (Nations Fund I, LLC):**

The Class 2 1 claimant shall receive payment according to the terms of the Settlement, filed as Docket No. #450 in this case, the terms of which are incorporated herein. The Settlement calls for the Debtor to sell the Nations Fund Collateral and pay specified proceeds (either $5.1 if Debtor is unable to include certain Graders in the sale or $5.5 million dollars if the Graders are included) to

24

Nations Fund.  In addition, Debtor shall pay $40,000 to Nations Fund on the Effective Date.  A motion to approve sale procedures is currently set for hearing on April 27, 2016.  If the Graders are not included in the sale, the purchase price shall be reduced to $5,100,000.00, and further treatment and payment for the Graders will be determined pursuant to future Court determination on the Nations Fund Adversary Action. Debtor will either deliver the Graders to Nations Fund or pay an additional $400,000 to Nations Fund. This class is not impaired. full payment of its allowed secured claim as set forth below; and shall retain first-position liens on the equipment identified in **Exhibit "4"** (hereinafter "Nations' Secured Equipment List")  As of the petition date, the amount alleged to be due under the  the loan by Nations Fund was $5,329,546.58.  The contractual interest rate for the loan was 12% per annum (non-default rate), and the maturity date of the loan was April 1, 2020.  Pursuant to the Ritchie Bros.' appraisal procured by Nations Fund. Nations Fund contends that its collateral was valued at approximately $5,645,400.00 as of February 4, 2015.  Debtor contends that the value of Nations Fund's collateral was significantly lower because: (1) the Ritchie Bros' appraisal included 3 pieces of Caterpillar equipment (valued at approximately $398,000.00) which was leased to Debtor, and not owned by Debtor, and thus, not validly encumbered by Nations Fund; (2) some of the valuations were overstated; and (3) the Richie Bros' appraisal was procured approximately seven months pre-petition, and therefore, the equipment should have been "depreciated" by seven months, at an assumed rate of $53,0000.00 per month, based upon the current adequate protection payments required to be made by Debtor to Nations Fund.  Unless otherwise resolved by Debtor and Nations Fund, the valuation of the Nations Fund collateral will be determined by this Court pursuant to the Motion to Value Collateral which is pending hearing.  Once that value is determined by the Court, the full amount of Nations Fund's Allowed Secured Claim will be paid as provided herein.

Debtor will sell $1,535,000.00 of equipment, free and clear of all liens at the time of

Confirmation. All sale proceeds from the sale shall be remitted to Nations Fund, which will be applied to reduce Nations Fund's allowed secured claim. The remaining balance of Nations Fund's allowed secured claim (hereinafter "Remaining Allowed Secured Claim") shall bear an interest rate of 6% per annum and shall be paid over a period of 42 months via monthly periodic payments in the sum of $53,000.00 per month, which payments shall commence on the 15th day of the next month following the Effective Date. Debtor will remit a balloon payment of the remaining balance of the Remaining Allowed Secured Claim 42 months following first periodic payment. Debtor shall have the option of extending the balloon payment date for six additional months by remitting to Nations Fund an additional payment towards the principal balance of the Remaining Allowed Secured Claim in the sum of $250,000.00 at or before the maturity date. The loan balance may be paid in full at any time prior to the maturity date without any prepayment penalty. Interest will only accrue as to the outstanding principal balance.

The Allowed Secured Claim shall receive new replacement liens on the Nations' Secured Equipment List identified in **Exhibit "4"** attached hereto, subject to the terms and conditions set forth herein. The replacement liens shall have first priority. Debtor shall have the unfettered right to sell any of the equipment on the Nations' Secured Equipment List, despite the replacement lien provided herein, providing that: (1) Nations Fund shall receive, at the close of each sale, the value of the equipment being sold pursuant to the value delineated on the Nations' Secured Equipment List (which values were obtained from the Ritchie Bros.' Appraisal procured by Nations Fund on February 1, 2016), subject to revision by Court Order pursuant to the outcome of Debtor's Motions to Value said collateral; and (2) in the event the equipment being sold procures a price in excess of the value set forth on **Exhibit "4,"** (as modified, if modified by Court Order), fifty percent (50%) of the excess proceeds shall also be paid to Nations Fund to pay down the remaing balance due on the Remaining Allowed Secured Claim. Nations Fund's replacement lien shall be deemed to be

~~terminated as to the equipment sold pursuant to the terms set forth above, so long as the required~~

~~payment is tendered to Nations Fund as required hereinabove. This class is impaired.~~

~~To the extent that the allowed secured claim is valued at less than the total loan balance,~~

~~Nations Fund shall have an unsecured claim, classified as an unsecured non priority claim (Class~~

~~12). This class is impaired.~~

~~In the event it is determined that Nations Fund is undersecured, then Nations Fund shall have the~~

~~ability to elect treatment under 11 U.S.C. §1111(b). In the event Nations Fund makes an 1111(b)~~

~~election, it shall be paid the present value of its Allowed Secured Claim in monthly equal periodic~~

~~payments over a period of 20 years, with no interest.~~

**Formatted:** Indent: First line: 0"

### 8.2.2    Class 2 (Caterpillar Financial Services Corp.)

The Class 2 claimant shall retain its existing security interest in the Caterpillar Equipment.

The current status of the loan is as follows:

|  | Balance | Value | Interest Rate | Remaining Term | Monthly Payment | Baloon Payment |
|---|---|---|---|---|---|---|
| Spectra Laser CB 460 | $37,934.94 | $30,000.00 | 4.95 | 13 mo | $3,100.87 | Remaining Balance |
| Spectra Laser Kit | $15,189.39 | $10,000.00 | 4.95 | 11 mo | $1,719.15 | Remaning Balance |

The plan treatment shall be as follows:

|  | Balance | Value | Interest Rate | Remaining Term | Monthly Payment |
|---|---|---|---|---|---|
| Spectra Laser CB 460 | $37,934.94 | $30,000.00 | 4.95 | 24 | 1,663.37 |
| Spectra Laser Kit | $15,189.39 | $10,000.00 | 4.95 | 24 | 666.02 |

To the extent not inconsistent with this paragraph, the terms and conditions of the existing promissory note and security agreement shall remain in full force and effect. This class is impaired.

### 8.2.3    Class 3 (John Deere Construction & Forestry Company):

The Class 3 claimant shall retain its existing security interest in the John Deere Equipment as follows:

| MAKE/MODEL | VIN |
|---|---|
| 310K EP Backhoe | 1T0310EKEDG245343 |
| 310K EP Backhoe | 1T0310EKVDG245319 |
| 310K EP Backhoe | 1T0310EKEEG266890 |

The current status of the loan is as follows:

| Account | Principal | Accrued Interest | Accrued Late Fees and Costs | Interest rate | Total |
|---------|-----------|------------------|-----------------------------|---------------|-------|
| 0705 | $149,448.27 | $1,213.60 | $781.16 | 1.90% | $151,443.03 |
| 5612 | $77,501.66 | $960.59 | $410.53 | 2.90% | $78,872.78 |
| TOTALS | $226,949.93 | $2,174.19 | $1,191.69 | | $230,315.81 |

| YEAR | MAKE/MODEL | VIN | BALANCE | VALUE | MONTHS REMAINING | INTEREST RATE | MONTHLY PAYMENT |
|------|-----------|-----|---------|-------|------------------|---------------|-----------------|
| | 310K EP Backhoe | 1T0310EKEDG245343 | $153,556.10 | $65,000.00 | 41 | 1.9 | $3,871.11 |
| | 310K EP Backhoe | 1T0310EKVDG245319 | see above | $65,000.00 | see above | see above | For both Pieces |
| | 310K EP Backhoe | 1T0310EKEEG266890 | $66,637.76 | $65,000.00 | 44 | 2.9 | $1,598.25 |

The plan treatment shall be as follows:

1.    The balance of Deere's claim related to Account 0705, on file herein as Claim 55-1, shall be modified to state a balance of $152,693.03.

2.    The balance of Deere's claim related to Account 5612, on file herein as Claim 56-1, a balance of $80,122.78, and the "Months Remaining" shall be modified to state 69 months.

| YEAR | MAKE/MODEL | VIN | BALANCE | VALUE | MONTHS REMAINING | INTEREST RATE | MONTHLY PAYMENT |
|------|-----------|-----|---------|-------|------------------|---------------|-----------------|
| | 310K EP Backhoe | 1T0310EKEDG245343 | $152,693.03 | 65,000.00 | 42.00 | 1.90 | $3,849.36 |
| | 310K EP Backhoe | 1T0310EKVDG245319 | see above | 65,000.00 | see above | see above | For both pieces |
| | 310K EP Backhoe | 1T0310EKEEG266890 | $80,122.78 | 65,000.00 | 69.00 | 2.90 | $1,262.09 |

To the extent not inconsistent with this paragraph, the terms and conditions of the existing promissory note and security agreement shall remain in full force and effect.  This class is impaired.

**8.2.4 Class 4 (Ford Credit):**

The Class 4 claimant shall retain its existing security interest in the Ford Vehicles.  The current status of the loan is as follows:

28

| MAKE/MODEL | VIN | Balance | Value | Months Remaining | Interest Rate | Monthly Payment |
|---|---|---|---|---|---|---|
| Ford F-150 | 1FTFWIEFOCFC12006 | 11,072.95 | 27,825.00 | 24 mo | 4.99% | $485.69 |
| Ford F-350 | 1FT8W3BT2EEA03938 | 35,136.76 | 41,150.00 | 39 mo | 1.90% | $929.74 |
| Ford F-150 | 1FTFW1ETXDKE23812 | 19,248.89 | 30,525.00 | 35 mo | 6.99% | $609.50 |
| Ford F-150 | 1FTFW1ET7DKE04683 | 24,182.00 | 33,500.00 | 35 mo | 6.99% | $765.74 |

The plan treatment shall be as follows:

| MAKE/MODEL | VIN | Balance | Value | Months Remaining | Interest Rate | Monthly Payment |
|---|---|---|---|---|---|---|
| Ford F-150 | 1FTFWIEFOCFC12006 | 11,072.95 | 27,825.00 | 36 mo | 3.50% | $324.43 |
| Ford F-350 | 1FT8W3BT2EEA03938 | 35,136.76 | 41,150.00 | 51 mo | 1.90% | $717.68 |
| Ford F-150 | 1FTFW1ETXDKE23812 | 19,248.89 | 30,525.00 | 50 mo | 4.50% | $422.90 |
| Ford F-150 | 1FTFW1ET7DKE04683 | 24,182.00 | 33,500.00 | 50 mo | 4.50% | $531.30 |

To the extent not inconsistent with this paragraph, the terms and conditions of the existing promissory note and security agreement shall remain in full force and effect. This class is impaired.

**8.2.5 Class 5 (Don Ahern):**

The Class 5 claimant shall retain his existing security interest in the identified vehicles. A true and correct list of the vehicles securing the Class 5 Claim is attached hereto as **Exhibit "45"** as "Ahern Vehicles". The current status of the loan is as follows:

| Loan | $150,000 |
|---|---|
| Interest | 10% |
| Remaining Months | 24 |
| Monthly Payment | $6,921.74 |

The plan treatment shall be as follows:

| Loan | $150,000 |
|---|---|
| Interest | 4.50% |
| Remaining Months | 48 |
| Monthly Payment | $3,420.52 |

To the extent not inconsistent with this paragraph, the terms and conditions of the existing promissory note and security agreement shall remain in full force and effect. This class is impaired.

**8.2.6 Class 6 (Ally):**

The Class 6 claimant shall retain its existing security interest in the Vehicle a 2015 Ford F-250SD VIN 1FTW2B61FEA22949. The current status of the loan is as follows:

29

The account currently has a monthly payment amount of $697.99 with 57 payments remaining.  The current interest rate is 7.60%.

The account is in arrears in the sum of  $1,420.98.  On the effective date of the Plan the arrears will be moved to the end of the loan and the interest rate will be reduced to 5%.  Debtor will continue to make monthly payments in the sum of $697.99 until paid in full.

| YEAR | MAKE/MODEL | VIN | Balance | Value | Months Remaining | Interest Rate | Monthly Payment |
|------|-----------|-----|---------|-------|------------------|---------------|-----------------|
| 2015 | Ford F-250SD | 1FTW2B61FEA22949 | $45,943.69 | $40,000 | 58 mo | 7.60% | $948.97 |

The plan treatment shall be as follows:

| YEAR | MAKE/MODEL | VIN | Balance | Value | Months Remaining | Interest Rate | Monthly Payment |
|------|-----------|-----|---------|-------|------------------|---------------|-----------------|
| 2015 | Ford F-250SD | 1FTW2B61FEA22949 | $45,943.69 | $40,000 | 64 mo | 5.00% | $893.33 |

To the extent not inconsistent with this paragraph, the terms and conditions of the existing promissory note and security agreement shall remain in full force and effect.  This class is impaired.

**8.2.7 Class 7 (Plaza Bank):**

The Class 7 claimant shall retain its existing security interests including those set forth in its loan documents and/or the Cash Collateral Stipulation [Dkt. #73]. The current amount of the loan is approximately $2,000,000.00, subject to increase for accrued interest, charges and costs (including legal fees) and subject to decrease to the extent principal payments are received pursuant to the Cash Collateral Stipulation (with the resulting amount due as of the Effective Date to be the new principal balance to be re-amortized pursuant to this Plan).  The loan bears interest at the rate of Prime plus 2.25% (currently 5.5%) per annum, calculated pursuant to the terms of the Note in favor of Plaza Bank, with a maturity date of Oct. 1, 2024.   This loan shall be modified only with respect to the amortization schedule, and shall be re-amortized and payments calculated based on a ten year amortization commencing on the Effective Date.  Through the month in which the Effective Date falls, Debtor shall continue to make monthly payments pursuant to the terms of the Cash Collateral

Stipulation.  The loan will mature, and any unpaid balance shall be due and payable in full, on December 31, 2024.  Debtor estimates that monthly payments will be approximately $21,170.59, and payments shall commence on the 15th day of the next month following the Effective Date (such that Debtor will not miss a monthly payment, with the amount of the payment to be calculated either pursuant to the Cash Collateral Stipulation or pursuant to the confirmed Plan).  The loan balance may be paid in full at any time prior to the maturity date without any prepayment penalty.  Interest will only accrue as to the outstanding re-amortized principal balance. Except with respect to the extended amortization and modifications provided herein, the terms and conditions of the existing promissory note, security agreement and other loan documents shall remain in full force and effect. Class 7 is Impaired under this Plan.  Holders of Class 7 Claims are entitled to vote on the Plan.

**8.2.8 Class 8 (Fidelity):**

The Class 8 Creditor has a claim of approximately $4,860,530.67.  Fidelity  has a junior UCC-1 security interest on certain identified personal property.  Creditor will be paid the value of its collateral  (estimated at $497,132.03) in monthly payments over four years, amortized over ten years with interest at 6% per annum and a ballon payment due at the end of the fourth year.  The balance of the claim will be classified as an unsecured non-priority claim (Class 12).   This class is impaired.

**8.2.9 Class 9 (Entrust):**

The Class 9 Creditor asserts a claim of approximately $500,000.00.  Claimant will be paid its allowed secured claim, if any,  in monthly payments over ten years with interest at 5% per annum.  The balance of the claim will be classified as an unsecured non-priority claim (Class 12). This class is impaired.

**8.2.10 Class 10 (Valley Bank):**

The Class 10 Creditor asserts a claim of approximately $400,000.00.  The allowed secured claim, if any  will be paid in monthly payments over ten years with interest of 4% per annum.  The

balance of the claim will be classified as an unsecured non-priority claim (Class 12). This class is impaired.

**Formatted:** Indent: First line: 0"

**8.2.11  Class 11 (Mechanic's Lien Claimants – Joint-Check Agreement Parties)**

The Class 11 Creditors are parties with mechanic lien rights and/or parties to Joint Check Agreements with the Debtor and the Owners/Developers. Pursuant to these creditors' pre-petition mechanic's lien rights, and Joint Check Agreement rights, these creditors have been receiving and will continue to receive payments directly from the Owners/Developers of the projects for which these claimants provided materials and/or labor. The remaining balances, if any, due to these Class 11 creditors will be classified as an unsecured non-priority claim (Class 12). This class is impaired.

**8.2.12 Class 12 (Unsecured Non-Priority Claims):**

Unsecured Claims in Class 12 shall receive ten percent (10%) of their allowed claims. Payments will be made in bi-annual distributions commencing on the first day of the sixth month after the Effective Date. From (1) $268,000.00 loaned/contributed by the Equity Member as "New Value" (which will be paid to this Class in lieu of repayment to Equity Member) plus (2) payments of not less than $70,000.00 per year for the next eight (8) to ten (10) years (as needed until the claims of this Class are paid as required herein), with the first payment due on the first anniversary of the Effective Date. The estimated Unsecured Non-Priority Claimants with allowed are listed in **Exhibit "~~6~~5"** attached hereto. This class is impaired.

**8.2.13 Class 13 (Membership Interest):**

In exchange for a ~~tota~~l New Value contribution consisting of a cash infusion on the Effective Date of no less than $232,000, as well as contribution of post-petition loans made to the Debtor in the approximate amount of $557,000 (the "Post-Petition Loans"), ~~in the sum of not less than $500,000.00 by~~ Equity Member~~, the member~~_ shall retain his membership interests in the

32

Reorganized Debtor, but shall receive no distribution until the payment obligations to Classes 1 through 12 are satisfied in accordance with the Plan. (Equity member may draw a salary as set forth in Section 10, below.)  ~~The New Value contributed by the Equity Member will be as follows:  (1) as of the date of this Disclosure Statement, Equity Member has loaned Debtor approximately $268,000.00 as an unsecured loan  pursuant to~~ Debtor did not seek or obtain court approval for the Post-Petition Loans.  ~~-~~The Equity Member contends that the Post-Petition Loans were appropriate pursuant to 11 U.S.C. §364(a), and that the monie~~ys loaned~~~~which funds~~ were necessary and required for Debtor, and reflected the types of loans commonly made by owners to their wholly-owned businesses to cover cash flow shortages~~who had insufficient operating capital due to an administrative hold on Debtor's operating account by Plaza Bank at the commencement of to remain operational~~.  The funds were used to pay the necessary obligations of Debtor, post petition, including, but not limited to, to remit wages to its employees, and to pay insurance premiums to ensure that insurance did not lapse, so that Debtor could continue operations.  Accordingly, Equity Member asserts that th~~e Post-Petition Loan~~is loan is~~ entitiled to administrative priority treatement pursuant to 11 U.S.C. §503(b)(1).  ~~The administrative claim will be to Class 12.  Thus, the return of these funds from Debtor will not be returned to Equity Member, but instead, will be paid to the Class 12 Claimants; and  (2) Equity Member shall contribute an additional amount, of not less than $232,000.00 on the Effective Date, which funds shall be utilized to pay administrative claims~~.

**8.2.14  Treatment of Unclassified Claims:**

**(A)    Administrative Claims**

Claims arising during the administration of the Debtor's Chapter 11 case and entitled to priority under Section 507(a)(1) of the Bankruptcy Code are not classified as a class under the Plan. Allowed Administrative Claims shall be paid consistent with the requirements of Section 1129(a)(9)(A).  Holders of such claims shall be paid in full on the latter of: (i) the Effective Date;

33

(ii) fifteen (15) days after entry of an order creating an Allowed Administrative Claim; (iii) such other date as may be fixed by the Bankruptcy Court; or (iv) such date as the Holder of such Claim and Debtor shall agree upon.  The amount of the Administrative Claims incurred, but unpaid as of the Confirmation Hearing is estimated to consist of (1) professional fees and US Trustee Fees which are estimated to be between $25̶00,000.00 and $36̶00,000.00; (2) normal accounts payable to be paid in the ordinary course; and (3) , which may increase or decrease depending on the number of contested matters in and the duration of the Chapter 11 Case.  This is comprised primarily of: (1) the P̶post P̶petition u̶n̶s̶e̶c̶u̶r̶e̶d̶ ̶l̶o̶a̶n̶(̶s̶)̶Loans made by Equity Member to Debtor pursuant to 11 U.S.C. §364(a); and (2) the  fees and costs incurred by Debtor's bankruptcy counsel, which is holding a retainer in the sum of $35,000.00, which will be applied against its Allowed Administrative Claim before counsel seeks any additional payment from Debtor.  Allowed Administrative Claims may be paid by Debtor or may be partially or fully paid by the Equity Member of the Debtor as a component of the Equity Member's New Value contribution.

      **(B)**    **Fees to the United States Trustee**

All fees required to be paid to the United States trustee will be paid in full upon the Effective Date of the Debtor's Plan, and shall remain current until the case is fully administered, closed, converted or dismissed, or a final decree entered; whichever occurs first.  Such fees may be paid by cash contributions by the member of the Debtor.

      **(C)**    **Priority Claims**

Allowed Priority Claims shall be paid in full within 60 months following the Effective Date as provided by 11 U.S.C. §1129(a)(9) in quarterly installments.

The Nevada Department of Taxation will  be paid in full by Reorganized Debtor: (i) in regular installments paid over a period not to exceed 5 years from the order of relief at nine percent (9%) interest per annum.

34

Additionally, nothing in this Plan shall prevent the Nevada Department of Taxation from proceeding against any and all responsible persons as defined by NRS 360.297.

**(D)    Disputed Claims**

Disputed shall not receive payment pursuant to the Plan unless and until such claims are allowed via final order.  Debtor, at its option, may establish a reserve for disputed claims.

**8.3     Means of Implementing and Funding the Plan**

**8.3.1    Contribution from Members**

David Rocchio, Sr. has loaned the Debtor approximately $557,000.00 since the Petition Date.  David Rocchio, Sr. did not file a Motion for approval nor obtain Bankruptcy Court approval of the loans under 11 USC §364, and considers such loans to be made in the ordinary course of business.  However, rather than request repayment of his post-petition loans, Mr. Rocchio is contributing such funds, as well as an additional cash infusion on the Effective Date of not less than $232,000, in exchange for retention of the equity interests in the Debtor.   At present, due to the fact that the obligations of the Debtor are well in excess of its assets, as well as the fact that substantially all of its assets are overencumbered, there is no monetary value of such equity interest.   ~~The Debtor's member shall contribute or has contributed the sum of not less than $500,000.00, consisting of $268,000.00 in post-petition loans and an additional amount of not less than $232,000.00 to be contributed as of the Effective Date by David Rocchio, Debtor's sole shareholder, which sums will be contributed for 100% ownership interest in the Reorganized Debtor.~~

**8.3.2   Continued Operation**

The Plan will be funded by the Debtor's income from the ongoing operation of its business and the Equity Contribution.  Debtor anticipates that this will be sufficient to make the payments due pursuant to the Plan.

35

### 8.3.3   Revesting of Assets in the Debtor

Subject to the provisions of the Plan, and as permitted by 11 U.S.C. §1123(a)(5)(B), and as authorized by 11 U.S.C. § 1141 (c), upon confirmation of the Plan, all property of the estate of the Debtor, including any litigation claims or choses of action, shall be transferred to Reorganized Debtor and revested in the Reorganized Debtor free and clear of all claims and interests of the creditors, except as expressly set forth in the Plan.  On and after the Effective Date, Reorganized Debtor may operate its business and may use, acquire, and dispose of property and compromise or settle any claim without the supervision or approval of the Bankruptcy Court and free and clear of any restrictions of the Bankruptcy Code or the Bankruptcy Rules, other than restrictions expressly imposed by the Plan or the Confirmation Order.

### 8.3.4   Disbursing Agent

The Debtor will serve as disbursing agent and shall make all payments required under the Plan.  The disbursing agent may employ or contract with other entities to assist in or to perform the distribution of the property and shall serve without bond.

### 9.   POST-CONFIRMATION FINANCIAL CONDITION OF THE DEBTOR

Following Plan confirmation, the Debtor believes that its post-confirmation financial condition shall be greatly improved by the restructure of high interest debt, as well as by the new work that Debtor has procured during the interim period.   Due to the strenuous and tireless efforts of Debtor and Equity Member, Debtor has procured over $11 Million in new construction contracts post-petition; and has tentative/pending additional new contracts in the approximate sum of $32 Million, which are slated to be consummated and commenced within the next few weeks and coming months.   Additionally, Debtor has been successful in procuring several public works contracts, as well as private contracts, thus returning to its more profitable area of work, while still retaining a diversified customer base.  Finally, because Debtor has an extensive 20-year operational

36

history in Nevada, Debtor is confident, based upon currently observed market conditions and trends, that Debtor's construction contracts will continue to increase as projected in Debtor's 5-year projection.    Again, based on Debtor's operational history, Debtor believes that no substantial operational changes need to be effectuated for the Debtor to continue operations and successfully perform its new construction contracts.  Debtor also believes that the current equipment owned by Debtor will be sufficient to perorm the work necessary in its 5-year projection; or that in the alternative, Debtor will be able to efficiently and effectively lease any equipment necessary, if necessary. These factors should result in increased revenue, controlled and manageable costs, and allow the Reorganized Debtor to timely pay all obligations under the Plan, as well as to be profitable in the future.

**10. <u>POST-CONFIRMATION MANAGEMENT OF THE DEBTOR</u>**

From and after the Effective Date, in accordance with Debtor's operational documents, the Reorganized Debtor shall be managed by its pre-petition President and Chief Operational Executive, David Rocchio, Sr.  Mr. Rocchio Sr. has approximately 25 years of management experience.  Mr. Rocchio Sr. will continue to draw a salary, which salary shall not exceed $150,000.00 annually (which is equal to or below the customary industry salary for the services to be provided), until such time as all required Plan payments have been remitted in full.  On and after the Effective Date, Mr. Rochio Sr. is authorized to issue, execute, deliver, and consummate the transactions contemplated or described in the Plan in the name of and on behalf of Reorganized Debtor without further notice to or order of the Bankruptcy Court, act or action under applicable law, regulation, order, rule, or any requirement or further action, vote, or other approval or authorization by any person, entity, or the Bankruptcy Court.

The continuation of Mr. Rocchio, Sr. in his management capacity post-confirmation is consistent with the interests of Creditors, Holders of Equity Securities, and public policy pursuant to

Section 1129(a)(5) because Mr. Rocchio, Sr. is intimately knowledgeable about Debtor's operations which he has operated since inception over 25 years ago, in addition to Mr. Rocchio, Sr.'s unique ability to generate work and procure construction contracts; and thus, uniquely qualified to operate the business and effectuate Debtor's Plan and thereby maximize the value for all Creditors of the Estate.

**11. ALTERNATIVES TO THE PLAN**

The Debtor believes that the Plan provides its creditors with the earliest and greatest possible value that can be realized on their claims.

Under § 1121 of the Bankruptcy Code, the Debtor has the exclusive right to file a plan of reorganization during the first 120 days after commencement of its Chapter 11 case, or as otherwise extended by the Court. The Plan was filed within such 120 day period. In addition, if the Plan is not accepted, other parties in interest may have an opportunity to file an alternative plan of reorganization.

Alternatively, a liquidation of the Debtor's assets could be conducted as described in Section 13 of this Disclosure Statement. For the reasons described in that section, Debtor believes that the distribution to each impaired class under the Plan will be greater and earlier than distributions that might be received in a Chapter 7 liquidation of the Debtor's assets.

**12. CERTAIN RISKS TO BE CONSIDERED**

HOLDERS OF CLAIMS AGAINST THE DEBTOR SHOULD READ AND CONSIDER CAREFULLY THE FACTORS SET FORTH BELOW, AS WELL AS THE OTHER INFORMATION SET FORTH IN THIS DISCLOSURE STATEMENT (AND THE DOCUMENTS ATTACHED OR DELIVERED HERE WITH AND/OR INCORPORATED HEREIN BY REFERENCE), IN DETERMINING WHETHER OR NOT TO ACCEPT OR REJECT THE DEBTOR'S PLAN. THESE RISK FACTORS SHOULD NOT, HOWEVER, BE REGARDED AS

CONSTITUTING THE ONLY RISKS INVOLVED IN CONNECTION WITH THE PLAN AND ITS IMPLEMENTATION.

**12.1  Risk of Non-Confirmation of the Plan**

Because the Plan provides for the reorganization of the Debtor as a going concern, many of the common risk factors found in typical reorganizations apply with respect to the Plan.  These include (a) the value of the Debtor's property has suffered significantly as a result of the downturn in the United States economy since the summer of 2009.  There is no assurance that the Debtor's projections of the stabilized income from the Property will occur, or that these projections will occur within the time period projected in the Plan; (c) because the Plan is dependent on continued construction work, there is a risk that the projections of net operating income, with which to pay the Allowed Claims of Creditors, may not be met; (d) if the secured creditors are not paid in accordance with the Plan, they may foreclose on all of the personal property.  Debtor is unaware of any regulatory contingencies or risks in connection with the Plan.

**12.2  Debtor Has No Duty to Update.**

The statements in this Disclosure Statement are made by Debtor as of the date hereof, unless otherwise specified herein. The delivery of this Disclosure Statement after that date does not imply that there has been no change in the information set forth herein since that date.  Debtor has no duty to update this Disclosure Statement unless ordered to do so by the Bankruptcy Court.

**12.3  Non-Consensual Confirmation**

In the event one or more impaired Classes of Claims does not accept the Plan, the Bankruptcy Court may nevertheless confirm the Plan at the Debtor's request, if all other conditions for confirmation have been met and at least one impaired Class has accepted the Plan (such acceptance being determined without including the vote of any "insider" in such Class) and, as to each impaired Class that has not accepted the Plan "does not discriminate unfairly" and is "fair and

39

equitable" with respect to the rejecting impaired classes.  The Debtor believes that the Plan satisfies those requirements.

**12.4    Tax Consequences of the Plan**

The Debtor believes that there are no federal income tax consequences peculiar to its Plan. EACH HOLDER OF A CLAIM IS STRONGLY URGED TO CONSULT WITH HIS/HER TAX ADVISOR REGARDING THE FEDERAL, STATE, LOCAL AND FOREIGN TAX CONSEQUENCES TO HIM/HER OF THE PLAN.

**12.5    Projections of Operations**

The Debtor's projection of its future income and expenses is set forth in **Exhibit "7̶6̶"** attached hereto.  Those projections are based upon historical operations and projected increase in projects.

**13. CONFIRMATION OF THE PLAN**

**13.1    Confirmation of the Plan**

Pursuant to Section 1128(a) of the Bankruptcy Code, the Bankruptcy Court will conduct a hearing regarding confirmation of the Plan at the United States Bankruptcy Court, 300 Las Vegas Boulevard South, Las Vegas, Nevada 89101, on March 1, 2016, commencing at 9:00 a.m.  To the extent necessary, the Bankruptcy Court may schedule additional hearing dates.  A separate notice of hearing will be provided to creditors and interested parties.

**13.2    Objections to Confirmation of the Plan**

Section 1128(b) provides that any party-in-interest may object to confirmation of a plan. Any objections to confirmation of the Plan must be in writing, must state with specificity the grounds for any such objections and must be filed with the Bankruptcy Court and served upon the following parties so as to be received, via mail, hand deliver, facisimle or email, on or before the time fixed by the Bankruptcy Court:

AJ Kung, Esq.
Brandy Brown, Esq.
Kung & Brown
214 S. Maryland Parkway
Las Vegas, Nevada  89101
(702) 382-0883
(702) 382-2720 Fax
ajkung@ajkunglaw.com
bbrown@ajkunglaw.com

For the Plan to be confirmed, the Plan must satisfy the requirements stated in Section 1129 of the Bankruptcy Code, which include the following requirements:

    **(A).    Liquidation Analysis – Best Interest of Creditors**

Pursuant to 11 U.S.C. §1129(a)(7), for the Plan to be confirmed, it must provide that creditors and Equity Security Holders will receive at least as much under the Plan as they would receive in a liquidation of Debtor under Chapter 7 of the Bankruptcy Code (the "Best Interest Test").  The Best Interest Test with respect to each impaired Class requires that each holder of an Allowed Claim or Equity Security of such Class either: (i) accepts the Plan; or (ii) receives or retains under the Plan property of a value, as of the Effective Date, that is not less than the value such Holder would receive or retain if Debtor was liquidated under Chapter 7 of the Bankruptcy Code.  For the reason set forth herein, Debtor submits that the Plan meets the Best Interest Test and provides value which is not less than what would be recovered by each such Holder under a Chapter 7 liquidation analysis.

In determining what Holders of Allowed Claims and Equity Securities in each impaired Class would receive in the event of a Chapter 7 liquidation, the Court must determine what funds would be generated from a Chapter 7 liquidation of Debtor's assets.  For general unsecured creditors, this amount would consist of the proceeds resulting from the disposition of the assets of Debtor, after deducting the costs and expenses of liquidation, including any amounts incurred for administrative claims (including Chapter 7 trustee's fees and costs, and other related accounting,

legal and other professional fees and costs), and/or for priority claims which would result from the forced termination of Debtor's business.  Any distribution would be paid pro rata according the amount of the Allowed Claim held by each Creditor.

Here, as set forth in further detail in **Exhibit "3,"** Debtor's assets are over-encumbered, and there will be no remaining proceeds after payment of the secured claims.  In sum, the value of Debtor's assets (including equipment, accounts receivables, cash in accounts, office furniture, and other miscellaneous inventor and items) have a liquidation value of approximately $7,834,136.87. Contrarily, the secured debt encumbering Debtor's assets total approximately $10,138,991.99 (See, Claims Registry and Secured Proofs of Claims filed).  In fact, under a hypothetical Chapter 7 liquidation analysis, it is evident that the secured creditors, who were under-secured as of the petition date, will not even be paid in full, thus; there will be no proceeds remaining after liquidation and payment of the secured debt.  The remaining under-secured and unsecured creditors, will receive no distribution pursuant to the "Absolute Priority Rule."  Because the secured debt so significantly exceeds the value of the assets, no further analysis need be considered with regards to the costs of liquidation, hypothetical Chapter 7 Trustee fees, reconditioning costs, etc…)  As such, the value provided under the Plan to Holders of Claims in the Impaired Classes is far  better than what they would receive under a Chapter 7 liquidation.  Specifically, Claims in Classes 9-11 would receive no distribution under a Chapter 7 liquidation, whereas they are entitled to receive at least some distribution (in varying amounts) under the Plan.  Therefore, the Plan satisfied the liquidation analysis; and confirming the Plan (rather than liquidating under Chapter 7) is in the best interests of the creditors.

**(B.)    Feasibilty.**

The Bankruptcy Code requires that in order to conform the Plan, the Banrkuptcy Court must find that Confirmation of the Plan is not likely to be followed by liquidation or the need for further

financial reorganization of Debtor (the "Feasiblity Test").  For the Plan to meet the Feasiblity Test, the Banktuptcy Court must find by a preponderance of the evidence that Debtor will possess the resources and working capital necessary to meet its obligations under the Plan.  As demonstrated by the previous discussion of Debtor's financial condition, and by **Exhibit "8~~7~~,"** identifying new constructions procured, Debtor's operations will generate sufficient cash flow to meet its payment obligations under the Plan and Debtor's sole Equity Holder will contribute not less than $500,000.00, which funds will be utilized to pay administrative claims and Class 12 Claims.  Based on the foregoing, Debtor is confident that it can establish, by a preponderance of the evidence, that the Plan is feasible within the meaning of Section 1129(a)(11).

(C.)    **Accepting Impaired Class.**

Since various Classes of Claims are Impaired under the Plan, for the Plan to be confirmed, the Plant must be accepted by at least one Impaired Class of Claims (not including the votes of insiders of Debtor).  For an Impaired Class of Claims to accept the Plan, those representing at least two-thirds (2/3) in amount, and a majority in number of Allowed Claims voted in that Class must be cast for acceptance of the Plan.

(D.)    **Allowed Claims**

You have an Allowed Claim if: (i) you or your representative timely files a proof of Claim and no objection has been filed to your Claim within the time period set for the filing of such objections; (ii) you or your representative timely filed a proof of Claim and an objection was filed to your Claim upon which the Bankruptcy Court has ruled and Allowed your Claim; (iii) you Claim is listed by Debtor in its Schedules or any amendments thereto (which are on file with the Bankruptcy Court as public record) as liquidated in amount and undisputed and no objection has been filed to your Claim; or (iv) your Claim is listed by Debtor in its Schedules as liquidated in amount and undisputed and an objection was filed to your Claim upon which the Bankruptcy Court has ruled to

43

Allow your Claim.

Under the Plan, the deadline for filing objections to Claims is one hundred and twenty (120) calendar days following the Effective Date, unless otherwise ordered by the Bankruptcy Court. If your Claim is not an Allowed Claim, it is a Disputed Claim and you will not be entitled to vote on the Plan unless the Bankruptcy Court temporarily or provisionally allows your Claim or Equity Security or if you have a dispute with Debtor, you should check the Bankruptcy Court record carefully, including the Schedules of Debtors, and you should seek legal advice. Debtor and its professionals cannot advise you about such matters.

(E.)    **Impaired Claims and Equity Securities.**

Impaired Claims and Equity Securities include those whose legal, equitable, or contractual rights are altered by the Plan, even if the alteration is beneficial to the Creditor or Equity Security holder, or if the full amount of the Allowed Claims will not be paid under the Plan. Holders of Claims which are not Impaired under the Plan are deemed to Have accepted the Plan pursuant to Section 1126(f) and Debtor need not solicit the acceptances of the Plan of such Unimpaired Claims. Holders of Claims or Equity Securities which are to receive nothing under the Plan are deemed to have voted to reject the Plan. As such, only Holders of Claims in Impaired Classes 1 and 4 under the Plan are entitled to vote.

(F.)    **Voting Procedures**.

a.    **Submission of Ballots**.

All Creditors entitled to vote will be sent a Ballot, together with instructions for voting, a copy of this approved Disclosure Statement, and a copy of the Plan. You should read the Ballot carefully and follow the instructions contained therein. Please use only the Ballot that was sent with this Disclosure Statement. You should complete your Ballot and return it via mail, facsimile, or email as follows:

Kung & Brown
Att: A J Kung/Brandy Brown
214 S. Maryland Pkwy,
Las Vegas, NV  89101
Phone:  (702) 382-0882,
E-Mail:ajkung@ajkunglaw.com
E-Mail: bbrown@ajkunglaw.com

TO  BE  COUNTED,  YOUR  BALLOT  MUST  BE  ***RECEIVED***  AT  THE  ADDRESS  LISTED

ABOVE BY MAY 18,  2016, 5:00 P.M. (PACIFIC TIME)

      b.     **Incomplete Ballots**.

Unless otherwise ordered by the Bankruptcy Court, Ballots which are signed, dated, and

timely received but on which a vote to accept or reject the Plan has not been indicated, will be

counted as a vote to accept the Plan.

      c.     **Withdrawals of Ballots**.

A Ballot may not be withdrawn or changed after it is cast unless the Bankruptcy Court

permits you to do so after notice and a hearing to determine whether sufficient cause exists to permit

the change.

      d.     **Questions and Lost or Damaged Ballots**.

If you have any questions concerning these voting procedures, if your Ballot is damaged or

lost, or if you believe you should have received a Ballot but did not received one, you  may contact

Debtor's counsel as listed above regarding the submission of Ballots.

14. **AVOIDANCE ACTIONS**

A bankruptcy trustee (or the entity as debtor in possession) may avoide as a preference a

transfer of property made by a debtor to a creditor on account of an antecedent debt while a debtor

was insolvent, where that creditor receives more than it would have received in a Cahpter 7

liquidation under the Bankruptcy Code had the payment not been made, if: (i) the payment was

45

made within ninety (90) days before the date the Chapter 11 Case was commenced; or (ii) if the creditor is found to have been an "insider" as defined in the Bankrutpcy Code, within one (1) year before the commencement of the Chapter 11 Case. A debtor is presumed to have been insolvent during the ninety (90) days preceding the commencement of the case. Debtor's transfers to insiders within the "preference period" consist solely of wages and rents which were at or below market value. The wages paid in the ordinary course of business for which fair value was received. The rents that were paid were paid when due and the lessors extended additional post-petition credit in the form of unpaid rent. In order to assume the lease contracts (which are vital to Debtor's operations), Debtor would need to assume the leases and pay all rents due. Debtor does not believe that there are any viable avoidance actions against insiders, and does not intend to bring any such actions. Transfers made within 90 days of the bankruptcy are listed at Dkt. 206 beginning on page 10. Such payments were made in the ordinary course of business, and Debtor does not contemplate bringing any preference actions.

A bankruptcy trustee (or the entity as debtor in possession) may avoid a fraudulent transfer of a transfer of property made by a debtor within two (2) years (and under applidable Nevada law, four (4) years) before the date the Chapter 11 Case was commenced if: (i) debtor received less than a reasonably equivalent value in exchange for such transfer; and (ii) was insolvent on the date of such transfer or became insolvent as a result of such transfer, such transfer left debtor with an unreasonably small capital, or debtor intended to incur debts that would be beyond debtor's ability to pay as such debts matrured. In addition, this reachback may be extended further to within one (1) year of reasonable discovery of the facts underlying the transfer and its actual fraudulent nature. Debtor is unaware of any claims for fraudulent transfer, and does not contemplate bringing any such claims.

Formatted: Indent: Left: 0", First line: 0.5"

**15. CONCLUSION**

Based on the foregoing, Debtor submits that the Plan provides the best possible recovery for all creditors, as a whole; and therefore recommends and respectfully requests that all Creditors who are entitled to vote on the Plan, vote to <u>accept</u> the Plan.

**DATED** this ~~10th~~ 22nd day of ~~March~~April, 2016.

KUNG & BROWN

By:   /s/ A.J. Kung
        A.J. KUNG, ESQ.
            Counsel for Debtor


CAPRIATI CONSTRUCTION CO., INC.

By:   /s/ David Rocchio
        David Rocchio, Sr., President